## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TENA M. RENTFRO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-3015 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant, | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Tena M. Rentfro appeals from the denial of her application for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income Disability benefits (SSI) under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Rentfro has filed a Motion for Summary Judgment (d/e 13), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 16).  The matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be affirmed in part and denied in part and remanded for further proceedings.

## STATEMENT OF FACTS

Rentfro was born on March 6, 1971.  She completed high school.

She has no past relevant work.  On August 9, 2010, Rentfro applied for DIB

and SSI benefits.  She alleged she became disabled on June 1, 1995.  Her

date last insured for DIB benefits was December 31, 1999.  Rentfro suffers

from post-traumatic stress disorder (PTSD), anxiety, depression, and

personality disorder.  Answer to Complaint (d/e 6), attached Certified

Transcript of Record of Proceedings before the Social Security

Administration (R.), at 14, 15, 17, 27, 49, 78.

On June 10, 2005, Rentfro saw psychiatrist Dr. Thomas Minogue,

M.D., for evaluation.  Rentfro was complaining of anxiety, depression,

difficulty sleeping, and panic attacks.  Rentfro reported that she had panic

attacks all her life.  Rentfro also reported that she had agoraphobia.

Rentfro reported that she recently stopped seeing a counselor, Kristy

Kinney.  R. 25.

During the mental status examination, Dr. Minogue observed that

Rentfro was alert with mild to moderate anxiety during the interview.

Rentfro spoke clearly, and her thoughts were relevant without delusions or

hallucinations.  Rentfro's affect was restricted, and her concentration and

judgment were adequate.  Rentfro was oriented and her memory was

intact.  Dr. Minogue diagnosed Rentfro with panic disorder with agoraphobia; major depressive disorder, recurrent; and generalized anxiety disorder.  Dr. Minogue assigned Rentfro a Global Assessment of Functioning (GAF) score of 55.  Dr. Minogue changed some of Rentfro's medications and recommended that she resume psychotherapy.  R. 332.

On January 6, 2006, Rentfro saw Dr. Minogue's Nurse Diane Kauffman, R.N.  Rentfro rated herself that day at 6 out of 10.  She reported that her medications were working.  She reported that she was doing well, "She feels overall she is doing well.  She is in therapy with Kristi Kinney and feels like it is going very well.  She reports that her panic is much better, and she feels that her current medication regimen is keeping it under control."  R. 315.  On examination, Kauffman observed that Rentfro was alert, and her thoughts were relevant.  Rentfro's affect was "slightly hypomanic."  R. 315.

On April 19, 2006, Rentfro saw Kauffman.  Rentfro rated herself that day at 9 out of 10.  Rentfro reported that things were going "great." Rentfro reported that her medications were "where they should be."  Rentfro reported that she has not had a panic or anxiety attack in two months. Rentfro reported that she had Xanax, but used it rarely.  On examination, Kauffman observed no evidence of anxiety, delusions, or hallucinations.

Kauffman reported that Rentfro's affect was "slightly hypomanic at times." R. 312.

On April 27, 2006, Rentfro saw Dr. Minogue.  Rentfro reported that her last panic attack occurred five months ago.  Rentfro reported that her last severe depression occurred two to three years ago.  She reported that she was sleeping better but still not acceptably.  Rentfro reported that she was about to undergo bariatric surgery and asked Dr. Minogue to provide an evaluation for her surgeon.  Dr. Minogue stated that Rentfro's depression was currently being treated successfully.  Dr. Minogue stated that Rentfro rated herself as a 9 on a scale of 1 to 10, with 10 being the best.  Rentfro reported that "I've been doing great."  Rentfro reported that continued therapy with Kinney was coming "great."  R. 310.

On examination, Dr. Minogue observed that Rentfro was alert; her speech was clear and well-paced; her affect was appropriate; her thoughts were relevant without delusions or hallucinations; she was oriented; her memory was intact; and her concentration and judgment were adequate. Dr. Minogue stated that Rentfro appeared to be a suitable candidate for bariatric surgery.  R. 311.

On July 13, 2007, Rentfro saw nurse Kauffman.  Rentfro rated herself at 5 or 6 out of 10 that day.  Rentfro reported she was feeling worse

because she recently had to "face a difficult funeral" and because she was "dealing with the extended family of one of her adopted children."  She reported that she could not have gotten through the funeral without taking Xanax.  She was out of Xanax.  Rentfro reported she was seeing a therapist and that was "going well."  Rentfro reported that she was "looking forward to her husband being on vacation next month and going to Holiday World with the children."  On examination, Kaufmann noted appropriate affect, some mild anxiety, and hand tremors.  R. 357.

On March 21, 2008, Rentfro saw Dr. Minogue.  Rentfro rated herself at 5 out of 10 that day.  She reported concerns over her ongoing adoption of one or more of her foster children, as well as problems with her sons' girlfriend and her teenager's depression.  Rentfro reported that therapy with Kinney was going well.  Rentfro reported that she had a panic attack the night before the appointment.  On examination, Rentfro was alert with clear speech, an appropriate affect, and "little, if any," evidence of anxiety.  Rentfro's thoughts were relevant without delusions or hallucinations.  R. 346.[1]

On January 9, 2009, Rentfro saw Dr. Minogue.  Rentfro rated herself at 6-7 out of 10 that day.  Rentfro reported feeling low because two family

---

[1] Dr. Minogue's notes only reference one boy being adopted, but Rentfro and her husband adopted five children.  R. 57-58.  It is unclear if the ongoing adoption proceeding referenced by Dr. Minogue concerned more than one child.

members passed away recently.  Rentfro reported that her therapy with

Kinney was going well.  On examination, Dr. Minogue noted mild anxiety.

Dr. Minogue observed further that Rentfro was alert; her affect was

appropriate; and her thoughts were relevant without delusions or

hallucinations.

Rentfro discussed with Dr. Minogue the possibility of getting a

companion dog.  Dr. Minogue made the following notes about the

discussion:

> Patient is requesting a companion dog.  Her current dog has
> really helped with her anxiety and she feels a huge sense of
> relief with having her dog around, but she feels that she would
> be able to completely get rid of her Klonopin and antianxiety
> medications if she had a legally trained companion dog that she
> could take into public places with her.

R. 337.  Dr. Minogue's notes on the treatment plan for that visit also

discussed a companion dog:

> The patient was instructed to check into what is needed to get a
> companion dog and to also spend some time thinking about the
> extra work and what is takes to have a dog.  Dr. Minogue told
> her that he would be willing to work something out with her
> regarding the companion dog.  He would be willing to write a
> note if the patient was willing to go off of her antianxiety
> medications.  The patient is going to spend some time thinking
> about that and evaluate all the possibilities, so there is still a lot
> that needs to be worked out with this and a lot of planning and
> thought that needs to go into it.  Patient is going to recheck in
> our office in six weeks.

R. 337-38.  The records do not indicate that Rentfro returned to see Dr. Minogue.

On February 23, 2009, Rentfro saw psychiatrist Dr. Michael W. Ernst, D.O., for a psychiatric assessment.  R. 403-04.  Kinney referred Rentfro to Dr. Ernst for evaluation and treatment.  R. 403.  Dr. Ernst found that Rentfro's memory was intact; her thoughts were somewhat tangential; her mood was anxious; and her affect was congruent.  Dr. Ernst diagnosed panic disorder with agoraphobia, major depressive disorder, and PTSD.  Dr. Ernst assigned a GAF score of 35-40.  Dr. Ernst modified her medications.  R. 404.

On March 23, 2009, Rentfro saw Dr. Ernst.  Rentfro reported that she was doing a little better with the medication change, but she was still having depression and anxiety.  R. 402.

On May 4, 2009, Rentfro saw Dr. Ernst.  Rentfro reported that she was stressed because her husband's friend and the friend's girlfriend were living with them.  Rentfro reported that she bought three additional mastiffs to start a kennel.  She reported that she wanted to go back to school to become certified as a dog trainer.  She reported ongoing anxiety and panic attacks.  The medications helped with sleep and anxiety.  Dr. Ernst increased the dosage of her medications.  R. 401.

On June 8, 2009, Rentfro saw Dr. Ernst.  Rentfro reported that the higher dosage left her too sedated.  She reported that her mood was much more stable, she was less anxious and less depressed.  She reported that she was able to leave the house much more frequently.  Dr. Ernst adjusted the dosage of her medications.  R. 400.

On August 10, 2009, Rentfro saw Dr. Ernst.  Rentfro reported that she was stressed out.  She reported that her son may lose his driver's license.  She also reported that her dog was "going through training to become a service dog."  Dr. Ernst wrote on the medical notes on a preprinted form.  Under the preprinted heading "OTHER ORDERS," Dr. Ernst wrote the words, "Therapy – Service Dog".  R. 398.

On November 2, 2009, Rentfro saw Dr. Ernst.  Rentfro reported that her brother had a heart attack.  She had not seen him in thirteen years.  She reported that he was abusive to her as a child.  She went to see him and he was abusive to her.  She reported that this event stirred up her PTSD symptoms.  She reported that she was working on these issues in therapy.  R. 397.

On December 29, 2009, Rentfro saw Dr. Ernst.  Rentfro reported that she was more anxious because all of her children were home on vacation.  R. 396.

On March 25, 2010, Rentfro saw Dr. Ernst. Rentfro reported that she increased her dosage of the medication Seroquel and was feeling better and sleeping well. She reported no change in side effects. R. 395.

On December 31, 2010, Rentfro completed a Function Report—Adult form as part of her disability applications. R. 233-42. Rentfro reported that she lived at home with her husband. She stated that she could not work because of her inability to leave her home,

> Wont leave house by self without my service dog or husband cant be in large groups cant focus have attacks leads to me having bad panic and anxiety attacks agoraphobia. Cant dill with stuff outside of home invironment!

R. 234 (punctuation and spelling errors in the original). Rentfro reported that during the day she got her children ready for school, cleaned her house, made supper, and got children ready for bed. She cooked and cleaned at home and took care of the pets. She also did the laundry. She reported that her husband and oldest son helped her around the house. Rentfro stated that she could not leave her home by herself. She also reported that she could not sleep without her medications. She stated she took a little longer than average to complete tasks because of some confusion. R. 235-36.

Rentfro reported that she went outside daily unless her anxiety was affecting her. She always went outside with her dog or her husband. She

drove a car.  She did not like to ride in a car as a passenger.  She wanted to be in control.   She did the shopping for the family, but always with her service dog.  She watched television and used the computer.   She sometimes went to church or school activities.  R. 238.

Rentfro reported that she could pay attention 30 to 45 minutes.  She did not follow written instructions well, "I usual can't concentrate long enough, I have to reread several times."  She did "much better" with oral instructions.  R. 239.  Rentfro stated that she did not handle stress or changes in routine well.  R. 240.

Rentfro reported that a doctor prescribed her service dog two years earlier.  Rentfro said she needed the service dog, "Going out of the house,--or any new situation, or anything out of my normal routine."  R. 240.  Rentfro concluded the Function Report—Adult form with the statement, "My Service Dog has made a lot of changes in helping me!"  R. 241.

On the same day, December 31, 2010, Rentfro's husband Jason Rentfro completed a Function Report—Adult—Third Party form.  R. 244-51.  Jason Rentfro stated that Rentfro "cannot leave the house or go any place without me or her service dog."  R. 244.  Jason Rentfro reported that Rentfro cleaned, cooked, took care of their children, took care of the pets, and took care of the house.  Jason Rentfro reported that Rentfro could not

do anything out of the house.  He also reported that Rentfro could not sleep through the night.  R. 245.  He also reported that Rentfro left the house with her dog or someone else for support.  He reported that she drove and did the grocery shopping.  He reported that she had trouble following written instructions, but did well following oral instructions.  R. 249.  Jason Rentfro reported that Rentfro did not handle stress or changes in routines.  He reported that she got panic attacks in such situations.  He also reported that Rentfro's doctor prescribed the service dog two years earlier, and Rentfro used the dog any time she was outside of the house.  R. 250. Jason Rentfro concluded,

> My wife is a great wife and mother but cannot function outside the home without me or her service dog.  We have delt (sic) with these problems for years, trying to work through these problems.  The service dog is really the best thing for her that actually works well.

R. 251.

On January 3, 2011, Rentfro saw psychiatrist Dr. Jeanie Thompson, M.D.  Rentfro reported that she was doing okay except for problems with one of her children.  On examination, Dr. Thompson found that Rentfro was oriented, her thoughts were clear, and her mood was somewhat depressed.  Dr. Thompson stated that Rentfro was stable on her

medications.  Dr. Thompson diagnosed PTSD and panic disorder with
agoraphobia.  R. 480.

On January 17, 2011, counselor Kristi Kinney, LCPC, wrote a letter
containing her opinions regarding Rentfro's condition.  Kinney stated that
Rentfro first saw her for assessment and counseling on October 8, 2002.
Rentfro attended counseling sessions twice a month for eight months and
less frequently thereafter.  Kinney stated that she has counseled Rentfro
for depression and PTSD.  Kinney stated that Rentfro's symptoms included
difficulty sleeping, hypervigilance, intrusive thoughts, fatigue, and low
energy.  Kinney stated that Rentfro suffered "from substantial fear and
anxiety most of the day."  Kinney stated that Rentfro frequently experienced
panic attacks.  Kinney concluded,

> Tena had struggled with these issues and symptoms for many
> years prior to presenting in this counseling office and continues
> to date to be negatively affected.  These mental health
> impairments have also prevented her from being able to attain
> or maintain employment.

R. 412.

On January 26, 2011, Rentfro saw her primary care physician,
Dr. Robert Wochner, M.D.  Rentfro saw Dr. Wochner for a physical for her
child care licensing.  Rentfro reported "no issues or problems health wise
other than some anxiety and depression issues."  Dr. Wochner noted that

her medications "have been stable."  The examination was unremarkable.
R. 491.

On January 31, 2011, state agency psychiatrist Dr. Glen Pittman,
M.D., prepared a Psychiatric Review Technique form for Rentfro.  R. 418-31.  Dr. Pittman opined there was insufficient evidence of any mental
impairment prior to Rentfro's date last insured, December 31, 1999.  R.
418, 430.

On February 7, 2011, Rentfro saw Dr. Thompson.  Rentfro reported
that she experienced lots of anxiety and light headedness when she went
to her children's ball games.  Rentfro also reported that she was having
trouble sleeping.  Rentfro also reported that she was working to get SSI
benefits.  Dr. Thompson stated that Rentfro was oriented, her thoughts
were clear, and her mood was fairly good.  Dr. Thompson stated that
Rentfro was doing well on her current medications.  Dr. Thompson
diagnosed PTSD, panic disorder, agoraphobia, attention deficit
hyperactivity disorder (ADHD), and dyslexia. R. 479.

On February 28, 2011, Rentfro saw Dr. Thompson.  Rentfro reported
that her mother-in-law recently passed away.  Rentfro also reported that
she had been a foster parent for fifteen years and it was time for the five-year renewal of her foster care privileges.  R. 478.

On March 16, 2011, Rentfro saw agency psychologist, Dr. Jerry L. Boyd, Ph.D., for a consultative examination.  R. 444-48.  Dr. Boyd found that Rentfro had a mild impairment of short term memory, but remote memory was intact.  Rentfro's intelligence was within normal ranges.  Rentfro's thought processes were normal without psychosis, paranoia, delusions, or hallucinations.  Dr. Boyd found that Rentfro's mood was "variable," with Rentfro reporting that she was depressed sometimes.  R. 445-46.  Rentfro reported that her medications "help 'a lot'". R. 444.

Rentfro reported to Dr. Boyd that she had daily anxiety symptoms.  Rentfro described the anxiety symptoms, "'Like an elephant stepping on my chest.  I want to cry.  I shake.  I lose focus.'"  R. 447.

Dr. Boyd diagnosed Rentfro with panic disorder, dysthymic disorder, PTSD, chronic by history; and ADHD, by history.  He assigned a GAF score of "(current/highest past year):  50/50".  R. 447.  Dr. Boyd opined:

> This examination of Tena Rentfro indicates the presence of depressive and social anxiety symptoms in a woman who reports the emotional and physical inability to meet the demands of employment.  There is a reported history of PTSD.  Current meds reportedly help extensively.  The Claimant has multiple physical and psychiatric complaints.  She appears to be of average intelligence and can follow moderately complex instructions.  She is an adequate communicator.  However, the Claimant appears to have a markedly reduced stress tolerance, particularly for novel or highly interpersonal settings.  The Claimant does appear to be of reduced persistence in

association with her depression, and anxiety.  The Claimant
appears to have a restricted coping repertoire.

R. 447-48.

On March 21, 2011, Dr. Pittman prepared another Psychiatric Review
Technique form and a Mental Residual Functional Capacity Assessment.
R. 451-68.  Dr. Pittman opined that at the time of his opinions, Rentfro
suffered from major depressive disorder, PTSD, and panic disorder.
R. 451, 454, 455.  Dr. Pittman opined that Rentfro's impairments caused
mild restrictions on daily living, moderate difficulties in social functioning
and in maintaining concentration, persistence, or pace.  R. 461.
Dr. Pittman opined that Rentfro was moderately limited in her ability to
understand and remember detailed instructions, to carry out detailed
instructions, to maintain attention and concentration for extended periods,
and to perform activities within a schedule, to maintain regular attendance,
and to be punctual without customary tolerances.  R. 465.  Dr. Pittman
further opined that Rentfro was moderately limited in her ability to interact
appropriately with the general public and to travel in unfamiliar places or
use public transportation.  R. 466.  Dr. Pittman concluded, in pertinent part:

Meds have helped a "lot," is compliant, does not seen (sic)
counselor as often as in the past.  She has a service dog which
she feels is necessary for her to go out in public.  MSE was
intact, feels depressed only sometimes.  She is involved in

childcare of he (sic) children, domestic chores and uses
computer.  She does drive.  PTSD relates to childhood abuse.
Concentration/persistence/social skills moderately impaired but
able to do simple, unskilled work.

R. 467.

On April 18, 2011, Rentfro saw Dr. Thompson.  On examination,

Dr. Thompson reported that Rentfro was oriented, her thoughts were clear,

and her mood was fairly good.  Dr. Thompson noted that Rentfro was

stable on her medications.  Dr. Thompson diagnosed PTSD, panic

disorder, agoraphobia, ADHD, and dyslexia.  R. 477.

On June 6, 2011, Dr. Thompson wrote a letter concerning Rentfro's

condition.  Dr. Thompson wrote, in pertinent part:

I am writing this letter on behalf of my patient, Tena
Rentfro.  I strongly feel that she needs to be on disability due to
her severe anxiety and agoraphobia.
Frequently she is so anxious that she can't leave her
home.  Her anxiety remains despite the fact that she is
receiving medication for her symptoms and also has a service
dog.
I feel that it is very unlikely that, even with further
adjustments in her medications, she will ever be stable enough
to hold a job.

R. 472.

On September 22, 2011, Rentfro saw Dr. Thompson.  Rentfro

reported that she was doing well.  She was upset about her son's girlfriend

problems.  On examination, Dr. Thompson reported that Rentfro was

oriented, her thoughts were clear, and her mood was fairly good.  R. 483.

On October 28, 2011, Rentfro saw Dr. Thompson.  Rentfro reported

that she was stressed out.  On examination, Rentfro was oriented, her

thoughts were clear, and her mood was good.  Dr. Thompson noted that

Rentfro was doing well on her current medications, and she did not need to

make any changes.  R. 482.

On December 16, 2011, Dr. Thompson wrote a letter concerning

Rentfro's condition.  Dr. Thompson wrote, in pertinent part:

> I am writing this letter on behalf of my patient, Tena Rentfro,
> who is currently under my care.  I very strongly feel that she
> should be put on disability for her psychiatric problems.
>
> Ms. Rentfro has severe panic attacks and agoraphobia.  She is
> unable to leave her home unless she is accompanied by her
> service dog or her husband.  She also has problems with
> hoarding and depression.  Her psychiatric problems would
> make it extremely difficult for her to work.

R. 485.

On March 30, 2012, counselor Kinney wrote another letter containing

her opinions regarding Rentfro's condition.  R. 493-94.  Kinney stated that

Rentfro first saw Kinney for assessment and counseling on April 28, 2003.

Kinney reported that since then, Rentfro attended counseling sessions "on

a weekly basis and at other times sporadically."  Kinney stated that she

counseled Rentfro for depression, anxiety, and PTSD. Kinney opined,

"Since Tena's initial presentation in this office to current date, I have never

known Tena to be able to work due to her mental health issues." R. 493.

Kinney also stated that Rentfro "was able to acquire a therapeutic disability

service dog in an attempt to assist with her symptoms of [PTSD]." R. 493.

Kinney reported that Rentfro had difficulty sleeping, intrusive

thoughts, low energy and fatigue. She stated that Rentfro's impairments

kept her from "performing tasks of daily living and self care" including

"keeping her house, and fixing meals." R. 493. Kinney stated that Rentfro

could not leave her home due to her anxiety. Kinney opined that Rentfro

had "difficulty concentrating and memory issues." R. 493. Kinney stated

that Rentfro suffered from "substantial fear and anxiety most of the day, on

most days." R. 494.

Kinney concluded,

Tena had struggled with these issues and symptoms for many
years prior to presenting in this counseling office and continues
to date to be negatively affected. She reports a substantial
mental health and psychiatric history for which she had always
been afraid to seek treatment up until her initial visit to my office
on April 24, 2003. These mental health impairments have also
prevented her from being able to attain or maintain
employment.

R. 494.

On June 12, 2012, Dr. Thompson completed a Medical Source Statement of Ability to do Work-Related Activities (Mental).  R. 501-03.  Dr. Thompson opined that Rentfro's mental impairments caused her to have a marked limitation in all aspects of her ability to understand, remember, and carry out instructions; an extreme limitation on her ability to interact appropriately with the public; and a marked limitation on her ability to interact with supervisors and co-workers; and a marked limitation in her ability to respond appropriately to usual work situations and changes in routine.  R. 501-02.  Dr. Thompson explained, "She has severe anxiety that makes it hard for her to leave her house she has a service dog."  R. 502.

On August 16, 2012, the Administrative Law Judge held an evidentiary hearing.  R. 42-77.  Rentfro appeared in person and with her attorney and her husband Jason Rentfro.  Vocational expert Dennis Gustafson also appeared.  R. 43.

At the beginning of the hearing, Rentfro's attorney informed the ALJ that he intended to submit certification of Rentfro's service dog status.  The attorney had not yet been able to secure the certification.  The ALJ asked whether anyone prescribed the use of a service dog.  Rentfro's attorney stated that Rentfro and her treating psychiatrist discussed the use of a

service dog.  The attorney referenced Dr. Ernst's medical records from his August 10, 2009, appointment with Rentfro.  R. 46.

The ALJ also confirmed that Rentfro did not allege that she had any significant physical impairment.  Rentfro's attorney confirmed that she was not alleging that her disability was due to any physical impairment.  R. 47.

Rentfro then testified.  She testified that she lived with her husband and her children.  R. 48.  She testified that she and her husband had eight children, three biological children and five adopted children.  R. 57-58.  She testified that six of her children lived with her and her husband.  She testified that the children at home were ages eighteen, seventeen, twelve, eleven, and six.  The ALJ did not ask her to explain why she only listed five ages for six children and she did not explain further.  R. 48.

Rentfro testified that she cared for the children and her husband.  Rentfro testified that she drove twice a month.  She testified that she had not worked outside the home for more than ten years.  She testified that she cared for the home and the children.  R. 49-50.

Rentfro testified that she could not work in a job because she could not stand being around crowds.  She testified, "I end up having panic and anxiety attacks which I am outside my home."  R. 50.  The ALJ asked whether she could work a job in which she worked by herself without any

interaction with coworkers and with little interaction with supervisors.
Rentfro responded, "I have a hard time sometimes getting out of bed."  She
explained that she got "depressed real bad."  R. 50.

Rentfro testified that she got depressed two to three times a week.
She testified that when she was depressed, she stayed in bed until 11:00
a.m. or noon, or sometimes all day.  She testified that this pattern of
depression two to three times a week had persisted for years, since
October 2001.  She testified that prior to 2001, she would only leave her
home with her husband or one of her older children.  R. 62.  She testified
that her brother committed suicide in October 2001.  He previously tried to
commit suicide in 1997.  Rentfro also testified that her mother died in 1995.
R. 52.

The ALJ asked Rentfro whether she and her husband had any
additional children in their home, such as foster children.  Rentfro testified
that they had not had any additional children in their home for six years.
R. 54.  Rentfro testified that she and her husband maintained their eligibility
to be foster parents "if anything were to happen, family members and stuff .
. . our card for foster care we would be updated on it."  R. 55.

Rentfro testified that she left the home with her husband to do
grocery shopping.  She testified that she no longer went to her children's

sports games.  She testified that she could not remember when she last went to a game.  R. 55.  She testified that she would have anxiety attacks and would have to leave the gym.  R. 62.  She acknowledged that she told Dr. Thompson in February 2011 that she attended games.  She testified that her husband recorded the games for her now.  R. 56.

The ALJ asked Rentfro whether she had problems functioning at home.  Rentfro testified that she had anxiety attacks at home "if something's happening with my family and things like that."  R. 56.  The ALJ asked her how she was able to care for her children.  She testified that she had two older children who no longer lived at home, ages twenty-two and twenty.  She testified that the twenty-two year old came to her house every day.  Her twenty year old son was in the military in Afghanistan.  R. 58.  She testified that her older children have helped take care of the younger children.  R. 60.  She testified, "There's many of us so we all depend on each other."  R. 61.

Rentfro testified that, as of the date of the hearing, she has had a service dog for four years.  She testified that Dr. Ernst suggested a service dog "since I had a hard time leaving the house without my husband or my kids and stuff."  R. 63.

Jason Rentfro then testified.  Jason Rentfro testified that Rentfro's condition was better prior to her brother's death in 2001, "She was better then.  She was actually really good.  She was still an introvert.  She still stayed at home a lot but she was able to go outside and go places.  It did not really, I guess the tip of the iceberg started happening when her brother committed suicide."  R. 67.

Jason Rentfro testified that he paid the bills and handled other financial matters for the family.  He did the grocery shopping recently, the "last dozen or so times."  R. 67.

Jason Rentfro testified that Rentfro was able to care for the children because she did not have to leave the house.  He testified that she was "exceptional" as a homemaker.  He testified that she was developing some hoarding tendencies.  He also testified that he attended all school meetings for the last six years.  She went with him to the school meetings, but would not go alone.  R. 69.

The ALJ asked Jason Rentfro's opinion about whether Rentfro could work at a job.  Jason Rentfro testified that he believed she could not work without having the service dog with her:

> Well, the best thing that is probably other than the medication . . . that's ever happened was the service dog.  She has been able to function better with the service dog.  She's able to go to Walmart, not often and it has to be on her criteria and it has to

be on a good day but India has helped her be able to get out of the house more where she feels safe and secure. . . .  The therapist's goal is to wean her off some of the other anxiety medications . . . because she's doing so well with the service dog but she doesn't go anywhere without the dog so therefore I don't think she can work at a facility or anywhere without having her service dog with her . . . ."

R. 70.  Jason Rentfro testified that Rentfro had good days one to two times a week and bad days two to three times a week.  R. 71.  Jason Rentfro also testified that her medication affected her sleep.  R. 71.

Vocational expert Gustafson then testified.  The ALJ asked Gustafson to assume a person with Rentfro's age, education, and work experience with no exertional limitations, but with the following non-exertional limitations:

> Assume the . . . limitation to the performance of simple and repetitive tasks involving little or no changes in work routine, no interaction with the general public, the least interaction possible in a competitive environment [with] co-workers.  I'll say occasional for now . . . and also the need to have the flexibility to basically perform a production paced job so you can be able to meet the employer standards on a per shift basis . . . .

R. 73.[2]  Gustafson opined that such a person could perform a limited range of building cleaning jobs that did not involve interaction with the public or

---

[2] Exertional limitations are limitations on the physical strength that a person can exert while working.  The Social Security regulations categorize jobs into exertional levels of sedentary, light, medium, heavy, and very heavy.  Non-exertional limitations are limitations on a person's ability to work that are unrelated to physical strength. Non-exertional limitations may result from physical pain or irritation from any source, from mental conditions, or other conditions not related to physical strength that interfere with a person's ability to perform a job.  See 20 C.F.R. §§ 404.1567 and 404.1569a.

co-workers.  Gustafson opined that at the medium exertional level 6,085

such jobs existed in Illinois and 1,120,000 nationally.  R. 73.  Gustafson

opined that employers would tolerate two absences per month from a

person working such a job. R. 75.

Gustafson defined the term "production paced" to mean that the work

did not "involve the need to perform at a consistent pace."  The employee

could vary the pace that she worked and the times for taking breaks "so

long as the job expectation is met during the entire work shift as opposed to

having to keep pace with a production line."  R. 76.  The hearing then

concluded.  The ALJ held the record open to allow Rentfro's attorney to

submit the information regarding the service dog.  R. 76.

On August 29, 2012, Rentfro's attorney submitted an undated letter

from Juli Ward Wright.  R. 301-02.[3]  Wright trained Rentfro's service dog.

Wright stated that she had forty years of experience training dogs.  She

stated that she was certified as a Master Trainer of disability dogs.  She

trained more than thirty service dogs for people with disabilities.  R. 301.

Wright stated,

> The dog I trained for Ms. Rentfro is trained to help her
> overcome her anxiety when in public places.  The dog is there
> to help calm her, also is there if Ms. Rentfro would have a panic

---

[3] The fax information on the tops of R. 301 and 302 indicate that Rentfro's attorney faxed the letter to the
ALJ on August 29, 2012.

attack her dog knows what to do to assist her through the attack.

R. 302.

## THE DECISION OF THE ALJ

The ALJ issued his decision on September 20, 2012. R. 14-29. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a severe impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing). 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If

the claimant cannot return to her prior work, then Step 5 requires a
determination of whether the claimant is disabled considering her RFC,
age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),
404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of
presenting evidence and proving the issues on the first four steps.  The
Commissioner has the burden on the last step; the Commissioner must
show that, considering the listed factors, the claimant can perform some
type of gainful employment that exists in the national economy.  20 C.F.R.
§§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569
(7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352
(7th Cir. 2005).

The ALJ also considered the different relevant time frames for
determining eligibility for DIB benefits and SSI benefits.  To be eligible for
DIB benefits, the claimant must be disabled prior to the date that she was
last insured.  The date last insured depends on the claimant's work history.
See 42 U.S.C. § 423(c)(1);  20 C.F.R. 404.131.  Rentfro's date last insured
was December 31, 1999.  R. 17.  A claimant may be entitled to SSI benefits
regardless of work history or dates of insurance; however, she may only be
eligible to receive benefits commencing on the date she applied for SSI

benefits.  20 C.F.R. § 416.335.  Rentfro applied for SSI benefits on August 9, 2010.

The ALJ determined that Rentfro met her burden at Step 1.  She had not engaged in substantial gainful activity since her alleged onset date of June 1, 1995.  R. 17.

The ALJ determined at Step 2 that Rentfro did not meet her burden with respect to DIB benefits, but did meet her burden with respect to SSI benefits.  With respect to DIB benefits, the ALJ determined that Rentfro failed to prove that she had a severe impairment before her date last insured, December 31, 1999.  The ALJ relied on the fact that Rentfro failed to present any medical evidence showing any impairments before that date.  Rentfro's medical evidence started in 2005.  The ALJ, therefore, found that Rentfro was not entitled to DIB benefits.  The ALJ limited the remainder of his analysis to Rentfro's claim for SSI benefits.  R. 18.

With respect to SSI benefits, the ALJ found that Rentfro suffered from anxiety, PTSD, depression and personality disorder.  R. 18.  The ALJ found that the medical evidence established that she had these impairments on August 9, 2010, the date she would first be eligible for SSI benefits. R. 18-19.

At Step 3, the ALJ found that Rentfro's impairments or combination of
impairments did not meet or medically equal any Listing.  R. 19-20.

At Step 4, the ALJ found that Rentfro had the RFC to perform a full
range of work without exertional limitations, but with the following non-
exertional limitations:

> limited to simple and repetitive tasks involving little or no
> change in work routine, no interaction with the general public,
> occasional interaction with coworkers and supervisors, and the
> flexibility to meet the competitive work production standards of
> an employer on a per shift rather than a per hour basis.

R. 21.  The ALJ relied on the evidence that Rentfro took care of a
household of six children and her husband and that she drove.  The ALJ
also relied on the repeated statements in the medical records that Rentfro
was stable and doing well on her meds, that her mood was often good, that
she reported that she went as long as five months without an anxiety attack
and as long as two or three years without significant depression.  The ALJ
also relied on the opinions of Dr. Pitman.  R. 27.

The ALJ also relied on the GAF findings of 55 by Dr. Minogue in 2005
and 50 by Dr. Boyd in 2011.  The ALJ noted that Dr. Minogue did not
assign Rentfro a lower GAF score during the time that he treated her.
R. 25.  The ALJ also stated,

> The undersigned acknowledges that a single GAF score is a
> temporary assessment of the claimant's adaptive functioning at

one precise and static moment in time.  However, the
longitudinal record does not support the finding that the
claimant's adaptive functioning was more than moderately
impaired because there are no lower GAF scores by acceptable
medical sources within the evidence in the record.

R. 27.

The ALJ gave little weight to the opinions of Kinney and Dr.

Thompson.  The ALJ found Kinney was not an acceptable medical source

and her opinions contained internal inconsistencies and were inconsistent

with other evidence in the record.  The ALJ noted that Kinney listed several

different dates as the first date Rentfro began seeing Kinney.  The ALJ

found that Dr. Thompson's opinions were inconsistent with Dr. Thompson's

own treatment notes in which she stated that Rentfro was doing well on her

medications and generally had a good mood.  The ALJ also found that Dr.

Thompson's opinions were inconsistent with other evidence in the record.

The ALJ discounted the evidence that Rentfro needed the use of the

service dog outside her home.  The ALJ dismissed Wright's statements in

her letter because Wright was not an acceptable medical source and

because she did not offer any firsthand knowledge of Rentfro's condition.

R. 22.  The ALJ further stated,

[T]he medial evidence of record does not indicate the claimant's
service dog was prescribed by any treating doctor, most notably
not a mental service specialist such as a psychiatrist or
psychologist.  The claimant's representative stated, of the

> service dog, at the claimant's hearing, "I don't believe it was
> prescribed but it has been discussed with the claimant's
> treating psychiatrist."  The undersigned notes that treatment
> notes from 2009 record the claimant "requesting a companion
> dog" from her psychiatrist and not being prescribed to her on
> the psychiatrist's initiative.

R. 22.  The ALJ referenced Rentfro's January 9, 2009, visit with Dr.

Minogue at the end of this quoted statement.[4]  The ALJ did not reference or

discuss the notation, "Therapy—Service Dog" from the August 10, 2009,

office visit with Dr. Ernst.  The ALJ, in fact, nowhere referred to Dr. Ernst's

treatment notes in his opinion.

After making the RFC determination, the ALJ found at Step 4 that

Rentfro had no past relevant work.  R. 27.  The ALJ proceeded to Step 5.

At Step 5, the ALJ found that Rentfro could perform a significant number of

jobs that exist in the national economy.  The ALJ relied on the Medical-

Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and the

testimony of vocational expert Gustafson, to find that Rentfro could perform

a significant number of cleaning jobs.  The ALJ concluded that Rentfro was

not disabled for purposes of her application for SSI benefits.  R. 27-28.

Rentfro appealed.  On November 13, 2013, the Appeals Council

denied Rentfro's request for review.  The ALJ's decision then became the

---

[4] The ALJ referred to Dr. Minogue's note by exhibit and page number, Exhibit 2F/4.

final decision of the Commissioner.  R. 1.  Rentfro then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's finding that Rentfro was not entitled to DIB benefits is supported by substantial evidence.  Rentfro presented no medical evidence that was contemporaneous with the time that she was eligible for DIB benefits.  The earliest medical evidence was from 2005, over five years

after her date last insured.  Kinney stated in her opinion letters written in

2011 that she began treating Rentfro in 2002, but Rentfro's condition

existed for years before treatment began.  Such retrospective opinion

evidence cannot be considered unless it is corroborated by evidence

contemporaneous with the eligible period.  See Liskowitz v. Astrue, 559

F.3d 736, 742 (7th Cir. 2009).  The finding that Rentfro was not entitled to

DIB benefits because she was not disabled before her date last insured,

December 31, 1999, was supported by substantial evidence.

With respect to Rentfro's claim for SSI benefits, the ALJ failed to build

the required "accurate and logical bridge from the evidence to his

conclusion."  The ALJ first erroneously stated that no acceptable medical

source ever assigned Rentfro with a GAF score of less than 50.  R. 27.

Dr. Ernst assigned Rentfro a GAF score of 35-40 in February 2009.

R. 404.  The records indicate that Dr. Ernst was a doctor of osteopathy.

R. 404.  A doctor of osteopathy is an acceptable medical source.  20 C.F.R.

§§ 404.1513(a)(a) and 416.913(a)(1).  Moreover, the medical records state

that Dr. Ernst was a psychiatrist.  Dr. Ernst signed Rentfro's February 2009

psychiatric assessment as a psychiatrist.  R. 404.  The subsequent records

of his treatment of Rentfro identified him as her psychiatric supervisor.

R. 395-403.  The Commissioner inferentially argues that Dr. Ernst is a

doctor of osteopathy and not a psychiatrist.  Commissioner's Memorandum

in Support of Motion for Summary Affirmance (d/e 17), at 7.[5]  The above

mentioned medical records contradict the Commissioner's argument and

the Commissioner cites no authority that a doctor of osteopathy cannot also

be a psychiatrist.  Thus, the evidence shows that, contrary to the ALJ's

assertion, an acceptable medical source, a psychiatrist, assigned Rentfro a

GAF score below 50.

The value of a GAF score may be debatable.  A GAF score may or

may not reflect a clinician's opinion of functional capacity.  The GAF score

is an assessment of both severity of symptoms and functional capacity.

The final score "reflects the worst of the two." Denton v. Astrue, 596 F.3d

419, (7th Cir. 2010).  The ambiguity inherent in the GAF score may explain

why the American Psychiatric Association (APA) decided to drop the GAF

score from its current diagnostic manual, the DSM-5,

> It was recommended that the GAF be dropped from DSM-5 for
> several reasons, including its conceptual lack of clarity (i.e.,
> including symptoms, suicide risk, and disabilities in its
> descriptors) and questionable psychometrics in routine practice.

---

[5] The Court uses the page number assigned by the Court's CM/ECF system.  The Commissioner did not
number the pages of her memorandum.

APA, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5), at 16.

The ALJ, however, found that the GAF scores were material in this case.  The ALJ relied on his erroneous finding that Rentfro was never assigned a GAF score below 50 as part of the basis for his RFC determination.  That was error.  Dr. Ernst assigned a GAF score of 35-40 in February 2009.  The error requires reversal and remand.

The ALJ failed to explain adequately the evidence relating his statement that no "mental services specialist" prescribed the use of a service dog.  R. 22.  The ALJ referenced the February 2009 discussion with Dr. Minogue, but did not refer to the August 10, 2009, note from Dr. Ernst.  Dr. Ernst wrote "Therapy—Service Dog" under the heading OTHER ORDERS.  R. 398.  Dr. Ernst's note raises a question of whether he prescribed or, at least, recommended the use of a service dog.  Rentfro's counsel specifically told the ALJ that Rentfro discussed the use of a service dog with her psychiatrist on August 10, 2009.  R. 45-46.  Rentfro testified that Dr. Ernst suggested the use of a service dog.  R. 63.  The ALJ should have been aware of Dr. Ernst's August 10, 2009, note regarding a service dog and should have discussed the note as part of his analysis of the evidence on this issue.  Likewise, as noted above, Dr. Pittman noted that

Rentfro had a service dog which she feels is necessary for her to go out in public.  R. 467.  Dr. Thompson also noted that Rentfro had a service dog.  R. 472.  Kinney also indicated that Rentfro "was able to acquire a therapeutic disability service dog in an attempt to assist with her symptoms" [PTSD]  R. 493.

The ALJ's failure to address adequately the evidence regarding the use of the service dog is material.  Gustafson opined that a person with Rentfro's age, education, experience, and RFC could perform cleaning jobs.  If the ALJ determines on remand that Rentfro's need for the service dog should be included in the RFC, Gustafson's opinions could change materially.  It is unclear to the Court that a person could perform a cleaning job if her RFC required her to take a service dog with her to the job site.

Additionally, the ALJ nowhere referenced the medical records from Dr. Ernst's treatment of Rentfro.  The records state that Dr. Ernst was a psychiatrist who treated Rentfro from February 2009 through March of 2010.  R. 395-404.  Many of his treatment sessions occurred within a year of Rentfro's August 9, 2010, application for SSI benefits.  Such evidence may be sufficiently close in time to be relevant to the question of Rentfro's condition in August 2010.  See 20 C.F.R. § 416.912(d) (Social Security Administration has the responsibility to "develop your complete medical

history for at least 12 months preceding the month in which you file your application unless there is a reason to believe that development of any earlier period is necessary . . . ."); SSR 83-20 (medical evidence prior to the alleged onset date may be relevant to assess the severity and duration of a claimant's impairments).

The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron, 19 F.3d at 333.  The ALJ is not required to discuss every piece of evidence, but he must build an accurate and logical bridge from the evidence to his conclusion.  Briscoe ex rel. Taylor, 425, F.3d at 355; Clifford, 227 F.3d at 872.  At this point, the Court cannot tell whether the ALJ considered Dr. Ernst's treatment records in making his decision.  In particular, the Court cannot determine whether the ALJ's considered Dr. Ernst's reference to a service dog in his treatment notes.  Under these conditions, the ALJ's decision with respect to Rentfro's claim for SSI benefits must be reversed and remanded.

On remand, the ALJ should also address more directly whether Rentfro's panic disorder with agoraphobia constitutes a severe impairment. A severe impairment is a condition that significantly limits a person's ability to perform basic work activities.  An impairment is not severe if it has no more than a minimal effect of the person's ability to work.  20 C.F.R. §

404.921; SSR 85-28, 96-3p, and 96-4p.  Drs. Minogue, Ernst, and Thompson all diagnosed Rentfro with panic disorder with agoraphobia. R. 332, 404, 480.  The ALJ did not list either panic disorder or agoraphobia as one of her severe impairments.  R. 18.  Rentfro's agoraphobia seems to have significantly affected her ability to leave her home.  The ALJ, however, did not identify her panic disorder with agoraphobia as a severe impairment, explain adequately how her panic disorder with agoraphobia was included within the impairments he identified, or explain why her panic disorder with agoraphobia was not a severe impairment.

If Rentfro's agoraphobia was a severe impairment, the ALJ should also address more directly on remand how her agoraphobia affected her RFC.  Rentfro and her husband testified that she could not leave the house without her service dog or her husband.  The ALJ found this testimony not to be credible because the testimony was inconsistent with other evidence in the record.  The ALJ should explain more thoroughly how other evidence contradicted this testimony.

The ALJ noted that Rentfro reported "looking forward to her husband being on vacation next month and going to Holiday World with the children".  The ALJ noted that this was suggestive of significant willingness to travel and participate in recreational activities in public.  From the context

of the quoted material, it is impossible to determine whether Rentfro was simply looking forward to her husband going on vacation with the children, or whether she traveled with them.  Likewise, if she traveled to Holiday World, it must be determined if she participated in public activities.  On remand, the ALJ should determine whether her inference that the Plaintiff was willing to travel and participate in public recreational activities is supported by the evidence.

In making her RFC assessment, the ALJ noted that the evidence did not indicate that the claimant's "mental impairment significantly affected her ability to tend to, care for, and rear children while her husband worked outside the home".  R. 23.  The ALJ found that it is reasonable to conclude that the claimant would not volunteer to steadily increase her family responsibilities significantly over the years if her mental impairments were of such severity and frequency that it progressively diminished her residual functional capacity.  R. 23.  The pertinent inquiry in this case is the ability of Rentfro to function in the workplace.  The Seventh Circuit has noted that "The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work".  Mendez v. Barnhart, 439 F.3d. 360, 362-363 (7th Cir. 2006).  Plaintiff also testified

that she received assistance in performing her work at home which presumably would be absent in the workplace.  (TR 60-61)  The ALJ should address the recognized distinction between work in the home with assistance from others, as compared to employment as a "cleaner" in the workplace, which was the ALJ's determination of the occupation for which the Plaintiff is suited given her RFC.

THEREFORE this Court recommends that Plaintiff Tena Rentfro's Motion for Summary Judgment (d/e 13), and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 16) should be ALLOWED in part and DENIED in part.  The decision of the Commissioner that Rentfro was not entitled to Disability Insurance Benefits under Title II of the Social Security Act should be AFFIRMED, and the decision of the Commissioner that Rentfro was not entitled to Supplemental Security Income Disability Benefits under Title XVI of the Social Security Act should be REVERSED and REMANDED for further proceedings consistent with this Report and Recommendation.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely

objection will constitute a waiver of objections on appeal.  <u>See</u> <u>Video</u>

<u>Views, Inc. v. Studio 21, Ltd.</u>, 797 F.2d 538, 539 (7th Cir. 1986).  <u>See</u> <u>Local</u>

<u>Rule</u> 72.2.

ENTER:   October 21, 2015


           *s/ Tom Schanzle-Haskins*
           UNITED STATES MAGISTRATE JUDGE